SOFTWARE 16, HERBERT M. KUSCHNER, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Software 16 v. Commissioner
Docket No. 4812-88
United States Tax Court
T.C. Memo 1992-247; 1992 Tax Ct. Memo LEXIS 265; 63 T.C.M. (CCH) 2876; April 27, 1992, Filed *265 Decision will be entered for respondent. Larry Kars, for petitioner. Elizabeth P. Flores and Stephen Ianello, for respondent. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined an adjustment to the partnership return of Software 16 for the 1982 taxable year due to disallowance of deductions for research and experimental expenses in the amount of $ 648,890, [1] $ 60,000 advertising expenses, and a $ 52,710 credit for research and experimental expenses. After concessions, the issues presented for our consideration are: (1) Whether certain payments under a research and development agreement *266 are deductible under section 174; [2] and (2) whether Software 16 was "at risk" within the meaning of section 465 for a $ 375,000 note. FINDINGS OF FACT The stipulation of facts and attached exhibits are incorporated herein by this reference. Software 16 (the partnership) is a partnership subject to the partnership audit and litigation procedures of sections 6221 through 6233. The partnership's principal place of business was located in New Rochelle, New York, at the time the petition was filed in this case. Petitioner also resided in New Rochelle, New York, at the time he filed the petition herein. The partnership timely filed a Federal partnership return for 1982 claiming deductions in the amounts of $ 648,890 for research and development, $ 60,000 for advertising, and a $ 52,710 credit for research and development. *267 [3] On December 29, 1987, respondent issued a notice of final partnership administrative adjustment to the partnership's tax matters partner disallowing all claimed deductions and credits. I. Background
Softtran Corporation (Softtran) was formed in 1976 to provide custom software to the business community. Sometime in 1982, Softtran decided to develop a proprietary accounting system designed specifically for the new generation of 16-bit [4] desktop microcomputers. The software package was to be marketed under the brand name Software 16. The funding for software development was initially provided by the partnership and subsequently by two additional limited partnerships. *268 The partnership was formed on October 4, 1982, with $ 371,000 of capital for software development. The partnership had 24 limited partners and 3 general partners -- John Stone (Stone), Martin May (May), and Herbert Kuschner (Kuschner). Stone earned a bachelor's degree and master's degree in electrical engineering. Several years after receiving his degrees, Stone went into business as an independent data processing consultant. His programming and consulting business prospered and eventually became Softtran. May had a bachelor's degree in electrical engineering and a master's of business administration degree in marketing. He was employed by Softtran and primarily responsible for sales and marketing of Softtran products. Kuschner was Softtran's accountant and attorney until December 1983. He provided the accounting background data necessary for completing Software 16 research and development. A second limited partnership was formed when additional capital was required to complete development of Software 16. The partnership lacked sufficient capital, and its partners were not generally required to make additional capital contributions. The second limited partnership, Software *269 16 II Limited Partnership (Software 16 II) raised an additional $ 850,000 in capital for Softtran. Stone, May, and Kuschner served as general partners, and 43 limited partnership interests were sold. The third limited partnership, Software 16 III Limited Partnership, was formed around December 31, 1984. The general partners of Software 16 III were Stone and Robert Weltzien (Weltzien). The tax liabilities of Software 16 II and Software 16 III are not at issue in this case. II. The Entities
A. Softtran Corporation
Softtran was incorporated in 1976 under the laws of the State of New York and was a Subchapter S corporation for Federal tax purposes. Softtran was founded by Stone to provide custom software to the business community. Custom software is specifically designed for a particular user. During 1982 Stone was the sole shareholder and president of Softtran. Stone subsequently became board chairman, and Weltzien became the president. During 1982, Stone received a salary of approximately $ 100,000 from Softtran. In May 1982, May joined Softtran as vice president of marketing. During 1983, May's income from Softtran was approximately $ 60,000. Softtran wrote *270 software specifically designed to operate on minicomputers and large scale mainframes in a multi-user environment. In 1978, Softtran became affiliated with Texas Instruments and began selling Texas Instruments' minicomputers. By 1982, Softtran expanded its product line to include microcomputers with prepackaged software developed by third parties. Softtran created custom software for several organizations including Chase Manhattan Bank, General Electric, Louis Dreyfus Corp., and Knapp Communications Corp. Softtran was a profitable corporation. Around 1982 there was an emergence of a new generation of 16-bit desktop microcomputers with larger internal memories. Prior to that time, almost all microcomputers had been based on 8-bit chips which were single terminal machines allowing only one user to complete one task at a time. With the advent of 16-bit chips, microcomputers could support several users at different terminals processing information at the same time. The software automatically kept track of what each user was doing, making sure that they did not interfere with one another. Softtran believed that substantial profits could be achieved by developing an accounting *271 software package designed specifically for the new generation of microcomputers. The target for the accounting software package was small to medium size businesses. The initial plan was to convert the existing system to one that ran on 16-bit microcomputers. The system to be designed, although similar to the existing system, was to contain many novel features. During the course of development of the accounting software package, Softtran decided to develop the accounting package from scratch because conversion from the existing system entailed more work than expected. The package consisted of six accounting modules: Accounts receivable; accounts payable; inventory management; sales order entry; payroll; and general ledger. The user could purchase one or more of the modules. The estimated selling price of the six modules to dealers was $ 2,000. These modules were designed to provide the user with a current accounting status of the user's business. Each module came with a demonstration file belonging to a fictitious company to give the user a working model of an active accounting system. In addition, a help line was provided to purchasers of the software which allowed a user *272 to call an 800 hotline number and obtain help directly from Softtran employees. The accounting software package was expected to include several new and unique features. First, the system was designed to contain help screens at each point in a module program telling the user the exact location in the program, outlining the different choices and the consequences thereof, and referencing the user to the exact page in the user manual. At that time, the help screens provided in competitive software only contained general guidelines. In addition, the Software 16 software had "windows". "Windowing" would allow the user to look at a document to be certain it contained all of the information the user required before the document was printed. During 1982 and 1983, there were four programmers working at Softtran. Softtran decided to discontinue its profitable custom software operations to devote its efforts toward developing Software 16. Thereafter, almost all of its revenue was attributable to fees received for developing Software 16. Around this time Softtran's four programmers began devoting 100 percent of their time to developing Software 16. In July 1983, William A. Roberts (Roberts) *273 joined Softtran to help market Software 16. In order to fund development and marketing of Software 16, Softtran formed limited partnerships. Stone and May estimated that it would cost $ 646,515 in research and development fees to develop and market Software 16. This figure is based in part on an estimated total programming and hardware expense of $ 290,400. Also, included in the research and development costs were amounts paid to Kuschner as a consultant. During 1982, Softtran claimed about $ 100,000 on its return for Software 16 consulting fees. Most of this amount was attributed to Kuschner's consulting fee. B. Software 16 Limited Partnership
The partnership is a calendar year limited partnership formed on October 4, 1982, under the laws of the State of New York. The partnership and Softtran were both located at 153 Pierpont Street, Brooklyn Heights. Under the terms of the partnership agreement, the partnership was to engage in research and development of a computerized accounting system for businesses to operate on certain microcomputers. The partnership agreement also provided that, "After development the Partnership intends to market such system to businesses, *274 computer manufacturers, softwear [sic] wholesalers, manufacturers, wholesalers and retailers." The partnership agreement provided that profits, losses, and capital would be allocated 90 percent to the limited partners and 10 percent to the general partners. Around December 1983, the partnership agreement was amended to provide a 99-percent profit distribution to the limited partners and 1 percent to the general partners. Pursuant to the private placement memorandum, up to 35 partnership interest units, at $ 10,600 per unit, were available for purchase. Kuschner, May, and Stone each solicited investors for the partnership. A total of 35 units of limited partnership interests were sold to the following 24 persons for an aggregate price of $ 371,000: Name
Units purchased
Joyce P. Austin
1  Sidney R. Cohen
1  Dr. Alber Faltas
1  Anne Forman
2  Louis R. Frumer
4  Eugene Galusha
2  Geoffrey Geane
3  Robert M. Ginns
1  Thomas Keating
1/2
Harvey A. Korngold
2  Marvin Kuschner
3  Arnold Licht
1  Martin May
1  Leonard Meyer
1  A. Nakhimovsky
1  Duncan Pardue
1/2
Mildred E. Phillips
1  Kenneth Plotnick
1  Larry Schneider
1  Edward L. Schultz
1  James Shepherd
1  Brian Sirota
1  Paul Steinborn
3  Morton D. Stone
1  *275 Limited partners Kenneth Plotnick and Larry Schneider were also Softtran employees. Limited partner Morton D. Stone was Stone's father, and limited partner A. Nakhimovsky was his brother-in-law. Limited partner Marvin Kuschner was Kuschner's cousin. Kuschner was either the accountant or lawyer for 10 or 12 of the limited partners. Limited partner Brian Sirota was May's brother-in-law. During 1982, Stone, Kuschner, and May each received a $ 20,000 guaranteed payment as management fees. Stone, Kuschner, and May did not receive any other compensation from the partnership. Under the terms of the partnership agreement, the limited partners were required to pay the $ 10,600 as follows: (1) $ 5,300 at closing; and (2) a subscription note of $ 5,300 payable by April 15, 1983. In addition, each purchaser of a limited partnership unit was subject to a capital call note of $ 10,714.28 on or before December 31, 1987. In the event that the combined level of sales for all sellers of 16-bit microcomputers reached 1 million units sold in the United States during the term of the note, the $ 10,714.28 obligation became null and void. The limited partners were not required to make any additional *276 contributions to the partnership. III. Software 16 Research and Development
On December 10, 1982, the partnership entered into a turnkey research and development agreement with Softtran. The promotional materials provided that the partnership would claim an immediate tax deduction for amounts paid under the turnkey agreement. Under the turnkey agreement, the partnership acquired from Softtran certain preliminary designs and concepts for the comprehensive 16-bit microcomputer accounting system computer program. Under the turnkey agreement, Softtran agreed to: (1) Perform all necessary work to refine and develop functional specifications for the proposed system; (2) program the system software; (3) document the software so that the system was understandable to the technical and nontechnical user; (4) test and field test the prototype for final evaluation; (5) apply for patents where applicable upon all or any part of the system; and (6) manage the entire project. All prototypes, drawings, specifications, patents, and manuals were the property of the partnership. Softtran agreed to perform the specified research and development on the condition that it retain the rights *277 to the software system for minicomputer and custom application. All work under the agreement was required to be completed on or before June 30, 1983. The completion date was subsequently extended to December 31, 1983. Softtran agreed to indemnify the partnership for any and all claims and costs arising from patent infringement and liability for damages from injury to any person performing services under the turnkey agreement. Softtran also agreed to indemnify the partnership for any product liability claim with respect to Software 16. The partnership was obligated to pay a research and development fee to Softtran in the amount of $ 646,515, payable as follows: (1) $ 89,400 in cash or check on or prior to December 31, 1982; (2) $ 19,935 prior to March 15, 1983; (3) $ 162,180 by a promissory note bearing no interest due on April 30, 1983; and (4) $ 375,000 by delivery of a promissory note entitled, "Recourse Promissory Note" bearing interest at 9-percent per annum. The partnership was required to make monthly installment payments equal to 50 percent of net profits from the sale of Software 16 under the terms of the $ 375,000 promissory note. The note was payable in full on or *278 before December 31, 1987. All limited partners of the partnership assumed a proportionate share of the promissory note represented by execution of the $ 10,714.28 capital call notes. The $ 375,000 promissory note was secured by a security interest in the software 16 computer program. If, during the term of the note, 1 million 16-bit microcomputers had been sold in the United States, the personal obligation of the partnership and the assumption by the partners thereto became null and void, and the note would be payable out of proceeds from the Software 16 accounting package. The 1 million figure represented the estimated minimum sales of microcomputers to make Software 16 a viable product. Softtran hoped to capture 1 or 2 percent of the market. If the estimated market had been captured, the $ 375,000 note would have been paid out of the sales proceeds from the accounting software package. The October 4, 1982, private placement memorandum concerning the partnership projected the following income tax results in 1982 by a taxpayer in the 50-percent bracket: Research & development expense
$ 648,900
General partner guaranteed payment
50,000
Amortization of organization expense
2,000
Research & development tax credit X 2
105,446
Total deductible
$ 806,346
Per unit
$  23,038
*279 The partnership paid $ 329,830 to Softtran during 1982 and 1983 comprising the following amounts: Date
Amount
12/13/82
$  30,000
12/22/82
2,650
01/03/83
10,000
01/28/83
48,000
01/21/83
37,500
02/18/83
20,000
03/03/83
13,680
04/05/83
5,000
04/15/83
18,000
04/27/83
25,000
05/13/83
92,000
05/13/83
8,000
06/23/83
17,000
08/29/83
3,000
Total
$ 329,830
During 1983, Softtran began experiencing severe cash-flow problems. Most of the funding provided by the partnership had been expended, and the corporation had discontinued its custom software operations. Softtran borrowed $ 158,500 from Kuschner to remedy the 1983 cash-flow problem. The $ 158,500 borrowed from Kuschner was used to complete development of the software package. The loan was never repaid by Softtran. Softtran exhausted all available funds before completing the software accounting package. In need of a substantial amount of additional capital, Softtran decided to form a new partnership rather than request additional contributions from the partnership's limited partners. By a letter dated November 21, 1983, Kuschner advised the limited partners that additional financing was necessary *280 to complete the software accounting package and cover marketing expenses. The limited partners were advised that the partnership was exchanging its rights in the software accounting package for a royalty arrangement. The limited partners were also advised that they would receive cash payments equal to at least what they would have received if the exchange had not occurred. Under the terms of the royalty arrangement, the partnership would receive 25 percent of gross sales until the limited partners received twice the $ 10,600 per unit cash investment and then a royalty of 5 percent of gross sales thereafter. Under the terms of the royalty arrangement, however, Softtran had the right to withhold 10 percent of the royalties until the $ 375,000 loan from the partnership was paid. On December 1, 1983, the partnership assigned all of its right, title, and interest in the accounting software package to Softtran in return for the royalty. No sales of the Software 16 accounting system had been made prior to November 23, 1983. Eventually, the partnership received royalties on about $ 100,000 worth of sales to approximately 24 businesses during 1984 and 1985. A portion of the 25-percent *281 gross sales was applied against the $ 375,000 note and the remainder of the 25 percent was distributed to the limited partners. This distribution, however, was very small. No additional royalty payments were received. Around December 31, 1983, Software 16 II was formed under the New York Limited Partnership Act. Before the formation of Software 16 II, four of the six modules of the accounting system had been substantially developed. Software 16 II was formed to provide financing for research and development on the payroll and general ledger modules. Software 16 II provided an additional $ 850,000 for Softtran. The general partners of Software 16 II were Kuschner, Stone, and May. Software 16 II then formed a joint venture with Softtran. Softtran contributed the accounting package software to the joint venture and Software 16 II contributed capital. The joint venture then contracted with Softtran to perform the remainder of the research and development. Under the terms of the joint venture, Softtran and Software 16 II were to share equally in proceeds derived from the sale of Software 16. Softtran had the option to buy out Software 16 II's interest in the joint venture in *282 return for a royalty based on gross sales of Software 16. This option could be exercised upon completion of the research and development and payment of $ 10,000. During 1984, Softtran's already severe cash-flow problems worsened. These problems increased because of the high cost of developing Software 16 and increased corporate debt. In addition, there were no funds available for marketing. Softtran used borrowed funds from Stone for marketing efforts. The loan from Stone was never repaid by Softtran. The accounting software package was introduced at the Comdex trade show in Atlanta, Georgia, during the spring of 1984. Software 16 was included in the new products section of Computer Dealer magazine during 1984. Software 16 was shown at a trade show in Las Vegas during the fall of 1984. Softtran also entered into marketing arrangements with several businesses. Softtran established a distribution system of 15 to 20 distributors who sold software with the intention that they would sell the software accounting package to their clients. Softtran also entered into licenses with various corporations. For example, on February 20, 1985, Softtran and Choice Retail Systems (Choice) *283 executed an agreement whereby Choice acquired a license to sublicense 800 copies of any of the Software 16 modules manufactured by Softtran. Choice was engaged in the business of selling computer hardware and licensing computer software. Softtran and Choice agreed that Choice would market and sublicense the Software 16 modules as a product of Choice under a brand or trade name of its own choosing. In exchange for the license, Choice agreed to pay Softtran an aggregate royalty in the amount of $ 40,000 on or before February 28, 1985. Pursuant to the February 20, 1985, agreement, Choice and AT&T Information Systems, Inc. (AT&T), executed a software license and development agreement for certain Software 16 modules. AT&T agreed to sell Software 16 under a private label of Choice. This arrangement did not prove successful; hence, substantial sales did not materialize in connection with the efforts of the AT&T sales force. Around December 31, 1984, Software 16 III was formed under the New York Limited Partnership Act. The general partners of Software 16 III were Stone and Weltzien. Softtran never recovered from its financial problems and went out of business in 1988. OPINION *284 We must first consider whether the partnership is entitled to a deduction for research and experimental expenditures for taxable year 1982. Respondent argues that the partnership is not entitled to any deduction for research and experimental expenditures because Softtran was the true owner of Software 16. Respondent also argues that the partnership is not entitled to deduct research and experimental expenses because the partnership never intended to enter into, and was not financially capable of carrying on, an active trade or business. Petitioner contends that the partnership activities were sufficient under the principles of Snow v. Commissioner, 416 U.S. 500 (1974), to meet the "in connection with" a trade or business requirement. Petitioner also argues that there was no prearranged scheme to sell, license, or otherwise dispose of Software 16 when the turnkey agreement was executed and, therefore, there existed the prospect that the partnership would engage in a trade or business involving Software 16. Petitioner bears the burden of proof on this issue. Rule 142(a). We note at the outset that the expenses incurred for developing Software 16 are deductible *285 expenses contemplated by section 174 even though the research and experimentation represented a continuation of r prior research efforts. If the partnership activities meet the trade or business requirement, its research or experimental expenses would qualify as deductible expenditures under section 174. Section 172(a)(1) allows a taxpayer to currently deduct research and experimental expenditures paid or incurred in connection with the taxpayer's trade or business. A taxpayer is entitled to a deduction for research and experimental expenditures for expenses paid or incurred by the taxpayer directly and expenses paid or incurred on the taxpayer's behalf by another person or organization. Sec. 1.174-2(a)(2), Income Tax Regs.
In Snow v. Commissioner, supra, the Supreme Court held that a taxpayer did not have to currently produce or sell any product in order to obtain a section 174(a)(1) deduction for research and experimental expenditures. This Court has concluded that to be entitled to a deduction the taxpayer must be engaged in a trade or business at some time and its activities must be sufficiently substantial and regular to constitute a trade or business. *286 Green v. Commissioner, 83 T.C. 667, 686-687 (1984). On numerous occasions, we have addressed the question of whether an entity is engaged in a trade or business or merely serves as a "vehicle for injecting risk capital into the development and commercialization" of a particular technology. Green v. Commissioner, supra at 687. The test applied for determining deductibility under section 174 is whether there is a realistic prospect that the technology to be developed will be exploited in a trade or business of the entity in question. See Diamond v. Commissioner, 92 T.C. 423 (1989), affd. 930 F.2d 372 (4th Cir. 1991). [5] The entity must reasonably anticipate availing itself of the privileges it possesses on paper. Levin v. Commissioner, 832 F.2d 403, 406 (7th Cir. 1987), affg. 87 T.C. 698 (1986). This is a facts and circumstances test. The relevant factors considered by the courts include: (1) The terms of the contractual arrangements; (2) the business or lack of business activities of the partnership; and (3) the lack of financial capacity and incentive of the *287 partnership to use the product in its own trade or business. The grant of an exclusive license to exploit technology prior to commencement of research and development may preclude a licensor from engaging in a trade or business with respect to the technology. [6]Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Levin v. Commissioner, supra at 726-727; Green v. Commissioner, supra.In Green, a partnership entered into a research and development agreement and on the same day divested itself of all ownership rights in the technology by granting an exclusive license to a research contractor for the life of the patentable technology. *288 We held that the taxpayer's partnership could not have been engaged in a trade or business as it had disposed of all of the incidents of ownership by assigning all its rights in the technology to a third party. Green v. Commissioner, supra at 688-689. Following this assignment, the partnership's activities were purely ministerial, and the taxpayers were mere investors. Similarly, in cases where the partnership grants *289 an option to exploit the technology to a research contractor, courts have held that there is no "realistic prospect" that the technology to be developed will be exploited in a trade or business of the partnership. See Diamond v. Commissioner, supra at 439. [7] In Diamond, the taxpayer argued that the option represented only a possibility that the licensee would acquire the license and, therefore, the prospect that the taxpayer would exploit the technology existed. Because the option could have been exercised for a relatively nominal amount, we concluded that the taxpayer was "prevented from engaging in the particular trade or business either by the law of contracts or the laws of economics." Diamond v. Commissioner, supra at 441. *290 In this case, the partnership did not grant a license or an option to Softtran at the time the turnkey agreement was executed but did enter into a royalty arrangement with Softtran the following year. Petitioner attempts to distinguish the aforementioned cases because the partnership did not grant a license or option to Softtran simultaneously with the execution of the turnkey agreement. We disagree with petitioner's argument. The substance of the transaction was such that the partnership did not have a realistic prospect of engaging in a trade or business involving Software 16. The partnership's role in the development of Software 16 never rose above the level of a mere investor. "An entity with no control over activities in which it invests is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities." Diamond v. Commissioner, supra at 443. Prior to execution of the turnkey agreement, Softtran owned all rights to the accounting package. Softtran formed the partnership as well as Software 16 II and Software 16 III, to fund development of the accounting package and entered into the turnkey *291 agreement with the partnership simultaneous with the ownership transfer. Although the general partners were involved in the research and development of Software 16, they were compensated for their services as Softtran employees. During 1983, Kuschner received approximately $ 100,000 for consulting fees, May received approximately $ 60,000 income for marketing Software 16, and Stone received approximately $ 100,000 in compensation. Softtran employees maintained an 800 hotline number for customers who had problems with Software 16. The partnership did not have a trade or business history either before or after the 1982 transaction. After the partnership was formed, its only activities were entering into the turnkey agreement and making payments to its general partners and Softtran. Conversely, by 1982, Softtran was a profitable corporation and created custom software for an established client base, including Chase Manhattan Bank and General Electric. During the course of developing the Software 16 accounting package, Softtran discontinued its profitable custom software development to focus on the Software 16 system to develop and market Software 16. The venture, from the partnership's *292 perspective, was substantially undercapitalized. All partnership funds were disbursed in payment of the obligations under the turnkey agreement and to the general partners leaving little to enable the partnership to enter the trade or business. Under the partnership agreement, the partners were not obligated to contribute additional funds for that purpose. [8] Moreover, the partnership did not have an incentive to use Software 16 in a trade or business because by means of the tax benefits, most of the investors in the partnership recovered their full investment the first taxable year. [9] See Levin v. Commissioner, 832 F.2d at 406-407. For example, limited partners who purchased two limited partnership units for $ 21,200 in the aggregate were allocated distributive shares of the partnership's ordinary loss in the amount of $ 40,508 (reflecting their distributive share of advertising and research and development expenses) and a research and development credit in the amount of $ 3,012. *293 Softtran had complete control over research and development of Software 16 under the terms of the turnkey agreement and for all practical purposes had complete control over marketing of Software 16 even though authority thereof was not specifically provided in the turnkey agreement. Although the partnership agreement stated that the partnership intended to market the software upon development, the partnership had neither the employees nor the resources for marketing. All efforts to market Software 16 were on behalf of Softtran. Softtran paid $ 100,000 annually to May for marketing Software 16 and hired Roberts in July 1983 to market Software 16. Softtran hired Roberts for Software 16 marketing prior to reacquiring the rights thereof from the partnership. Softtran entered into marketing arrangements with several businesses and established a distribution system of 15 to 20 distributors. Finally, Softtran entered into licenses with various corporations. Accordingly, the partnership is not entitled to the deduction for research and experimental expenditures because it was not in the trade or business of developing the computer software accounting package. Although it is not necessary *294 for the partnership to have personally developed the package in order to be entitled to the deduction, the facts show that the partnership was merely an investor involved in a financing transaction. Our holding that the trade or business requirement of section 174 was not met obviates the need to address the issue concerning whether the partnership was at risk with respect to the promissory note. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. Although the agreement between the parties required payment of $ 646,515, the partnership claimed a deduction in the amount of $ 648,890. An unexecuted copy of a turnkey agreement was included in the private placement memorandum. The unexecuted copy stated that the fee for research and experimentation was $ 648,900. However, the executed turnkey agreement stated that the fee was $ 646,515.↩
2. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. On brief, petitioner conceded that the partnership was not entitled to the claimed advertising expenses and credit for research and development for taxable year 1982.↩
4. A "bit" is the smallest part of information that the computer recognizes; a bit is represented by the presence or absence of an electronic pulse.↩
5. See also Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Property Growth Co. v. Commissioner, T.C. Memo. 1988-258, affd. without published opinion 889 F.2d 1090↩ (8th Cir. 1989).
6. In two recently issued Memorandum Opinions of this Court, we disallowed the deductions claimed for research and experimental expenditures even though the licenses had not officially been entered into upon execution of the research and development agreement. See Stauber v. Commissioner, T.C. Memo. 1992-128 (facts indicated that a "pre-existing understanding" concerning a future license existed); Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572↩ (there existed an "understanding" regarding a future license of the technology).
7. See also Scoggins v. Commissioner, T.C. Memo. 1991-263; Scientific Measurement Systems I, Ltd. v. Commissioner, T.C. Memo. 1991-69; Coleman v. Commissioner, T.C. Memo. 1990-357; Harris v. Commissioner, T.C. Memo. 1990-80↩.
8. See Scientific Measurement Systems I, Ltd. v. Commissioner, supra; Harris v. Commissioner, supra↩.
9. The limited partners recovered their full investment during the first taxable year if they were in the 50-percent tax bracket. Based on income projections, approximately 70 percent of the limited partners were in the 50-percent tax bracket. With the exception of one limited partner, all other limited partners were in the 35-percent bracket or higher.↩